MONTGOMERY *et al. v.* CLEVELAND.

[98 So. 111.   No. 23643.]

(En Banc. Nov. 5, 1923. Suggestion of Error Overruled Dec. 17, 1923.)

1. STATES. *Governor "absent" when he leaves state; functions of office of Governor vested in Lieutenant Governor during absence of Governor, if able to perform duties.*

Under Constitution 1890, section 131, providing that, "when the Governor shall be absent from the state, . . . the Lieutenant Governor shall discharge the duties of said office until the Governor [shall] be able to resume his duties," the Governor is absent when he leaves the state, and in such case the functions of the office are vested in the Lieutenant Governor, if in the state and able to perform the duties, during such absence (quoting Words and Phrases, Second Series, "Absent").

2. PARDON. *States. Powers of Governor cease, on leaving state, until return; Lieutenant Governor may grant pardon during absence of Governor from state; granting of pardons function of state, and not personal act of Governor; and granted out of considerations of public policy.*

Under section 124 of the Constitution of 1890, providing, "In all criminal and penal cases, excepting . . . treason and impeachment, the Governor shall have power to grant reprieves and pardons," and under section 131 of the Constitution of 1890, providing, "When the Governor shall be absent from the state, . . . the Lieutenant Governor shall discharge the duties of said office until the Governor be able to resume his duties," when the Governor leaves the confines of the state, his powers as Governor cease until he returns thereto, and during such absence the Lieutenant Governor is clothed with all the functions of the Governor's office, and may grant a pardon to a person convicted of crime. The granting of pardons is a function or act of the state, and not the personal act of the person occupying the office of Governor, and pardon is granted out of considerations of public policy.

ANDERSON and COOK, JJ., dissenting.

APPEAL from chancery court of Sunflower county. HON. E. N. THOMAS, Chancellor.

*Habeas corpus* by Walter Cleveland against W. A. Montgomery and others, trustees, and another, for discharge from the state penitentiary on a pardon issued by Lieutenant Governor. From a judgment affirming the writ, the trustees and superintendent of the state penitentiary appeal. Affirmed.

*Clayton D. Potter,* Attorney-General, and *H. T. Odom,* Assistant Attorney-General, for appellants.

I. Has the Lieutenant-Governor under our Constitution the power to grant pardons during a temporary absence of the Governor from the state? The Constitution of 1832 provided: "Whenever the office of Governor shall become vacant by death, resignation, removal from office, or otherwise, the president of the Senate shall exercise the office of Governor, until another Governor shall be qualified."

Our Constitution of 1869 provides: "When the office of Governor shall become vacant, by death or otherwise, the Lieutenant Governor shall possess the power and discharge the duties of said office. When the Governor shall be absent from the state, or unable, from protracted illness, to perform the duties of the office, the Lieutenant-Governor shall discharge the duties of said office until the Governor be able to resume his duties."

Section 131 of the Constitution of 1890 is the same as the above from the Constitution of 1869. After some diligence in the investigation, we think it safe to assert that no other state Constitution has undertaken to and has separated the duties and powers of this office as is done in Mississippi, so *In re Crump,* 135 Pac. 428, and *People* v. *Wells,* 1 Cal. 198, are not in point.

The following cardinal rules of construction apply to this case: It is to be presumed that the utmost discrimination was used in the words employed. Words used are to be given their ordinary meaning. Meaning must be given to each word and part of the Constitution, and no meaning is to be given to any part that will render any other part inoperative or meaningless. Where the words that are employed involve no absurdity or contradiction, the court cannot properly take from the meaning of the word used. Where the true sense in which words are used is clear, no resort can be had to construction. Words and phrases are to receive the same meaning throughout the Constitution.

Considering section 131 under the above rules, it is seen that by the first sentence, that when the office shall become vacant—that is when the succession is complete, that all official functions devolve upon the heretofore Lieutenant-Governor, that is, he then in that event alone, shall "possess the powers and discharge the duties of said office." And by the second sentence, when the Governor shall be absent from the state or unable from pro-

tracted illness to perform the duties of the office, the Lieutenant Governor merely discharges the duties of the office; thus, limiting him to but one function—that of seeing that those things required by law to be performed by the Governor are (to use the constitutional word), performed. The forgiveness of crime is a "power."

A pardon is an act of grace proceeding from the power entrusted with the execution of the law, which exempts the individual on whom it is bestowed, from punishment the law inflicts. *United States* v. *Wilson,* 7 Peters 160; 1 Bishop's Criminal Law, 898; *Cook* v. *Middlesex,* 26 N. J. 326; *Roberts* v. *State,* 160 N. Y. 217; *State* v. *Kirby,* 96 Miss. 629; *Ex Parte Hickey,* 4 H. M. 751.

The duties mentioned in the second paragraph of section 131 of the Constitution are those things that the law requires that the Governor shall do, and about which he has no election, whether it should be done or left undone. The Constitution makers in withholding from the temporary occupant of the Governor's chair the "powers" of the office, guarded against the possibility of an inconsistent, wasteful, and confused administration.

In construing a constitutional provision, the meaning of which cannot be ascertained from the language used, the court will consider the contemporaneous, practical construction placed on it by the legislature and publicly and uniformly acquiesced in. *Chismon* v. *Brookhaven,* 70 Miss. 477; *Wesson* v. *Collins,* 72 Miss. 844.

II. If the Lieutenant Governor has the power to issue pardons during the temporary absence of the Governor from the state, is the absence of only a few hours, and only a portion of a day, such absence as is contemplated within the constitutional provision?

The framers of the Constitution did not intend that the Lieutenant Governor should assume the duties of the office of Governor and usurp the prerogatives of that office on a mere temporary absence when the Governor

was without the state but within only a few minutes ride of the Capital. *State* v. *Lahiff*, 146 Wis. 490, 131 N. W. 824, Ann. Cases 1921C, 350; *Watkins* v. *Mooney*, 114 Ky. 646, 71 S. W. 622.

The question at bar was considered but not decided by the Nebraska supreme court in the case of *People* v. *Parker*, 3 Neb. 409, 19 Am. Rep. 634. The Missouri supreme court in the case of *Crittenden* v. *Walker*, 78 Mo. 139, held that temporary absence of the Governor from the state in the discharge of duties imposed upon him by the law does not, of itself, authorize the Lieutenant Governor to assume functions of the Governor's office during his absence. In our humble judgment the case of *State* v. *Graham*, 26 La. 568, 21 Am. Rep., 551, is the most persuasive authority in point.

*Francis Harmon* and *Eastland & Nichols*, for appellee.

The sole question presented to this court is the validity of the pardon issued by the Lieutenant Governor in his capacity as Acting Governor during the temporary absence of the Governor from the state.

I. Any absence from the state renders the governor unable to perform the duties of the office. It will be noted that two situations are provided for; (1) absence from the state; (2) or unable from protracted illness to perform the duties of the office. It is thus clear that the framers of the Constitution intended that at every single moment the ''chief executive power'' mentioned in section 116, should be exercised by some person within the sovereign confines of the state. The sentence in question does not say, ''when the governor shall be absent from the state *and* unable to perform the duties.'' On the other hand, the mere fact of absence in and of itself incapacitates the chief executive from exercising the functions of his office.

It is insisted that a temporary absence is not such absence as is contemplated, but appellants fail to draw the line and tell us at what point absence, under section 131, begins. It is perfectly clear that when the chief executive steps over the line he is "absent from the state." Words and Phrases, Second Series, page 16; *Jilton* v. *Babson,* 88 Mass. 325; *Curd* v. *Letcher,* 26 Ky. 445; *Wheeler* v. *Wheeler,* 35 Ill. App. 124; *Covart* v. *Hoskins,* 18 Pac. 523; *Paine* v. *Drew,* 44 N. H. 306; *Manners* v. *Ribsan,* 41 Atl. 677; *Skinner* v. *Board of Commissioners of Dowley,* 66 Pac. 637; *O'Mally* v. *McGwin,* 10 N. W. 517.

A direct authority in point absolutely conclusive of this question is *In re Crump,* 135 Pac. 428, 47 L. R. A. (N. S.) 1036. This is the leading case on the entire subject.

Appellants base their contention for a strained meaning of the word "absent" upon the case of *Watkins* v. *Mooney,* 71 S. W. 622, but a careful study of that case shows the passage cited in appellants' brief to be a clear *dictum.* Appellants also cite in their brief the case of *State* v. *Lahiff,* 146 Miss. 490, which rests upon the authority of *Watkins* v. *Mooney,* the court seizing upon the *dictum* therein without properly appreciating the real grounds of that decision.

II. Though a pardon be an act of grace it is the duty of the executive to issue a pardon in a proper case. Appellants seek to draw a distinction between the "powers" and "duties" of the Governor's office, and limit the Lieutenant Governor to those acts which are expressly named as duties. No such distinction is possible. Given the power to act, there is a duty to exercise this power in a proper case. Given the duty to act, there must be adequate power to carry out this duty, else the imposition of the duty is utterly vain.

Appellants strenuously insist that in the case of absence from the state, or such protracted illness as would render the Governor unable to serve, the Lieutenant Governor can only do those things listed in the Constitution and statutes of the state as "duties."

Appellee takes the position that the phrase "powers and duties" used only in regard to a vacancy in the office refers to "the tenure of the office," whereas, the phrase "discharge the duties," as used in the second sentence of section 131, is used in the sense of "perform the functions" in contradistinction to "hold the tenure." *Chadwick* v. *Earhart*, 4 Pac. 1180.

If the Lieutenant Governor can do none of the things enumerated as "powers" while the Governor is absent from the state for an hour, a day, or a week, then by the same token the Lieutenant Governor cannot exercise this power if the Governor "is unable from protracted illness to perform the duties of his office." What the Lieutenant Governor can do in the one case, he can do in the other; what he cannot do during the temporary absence of the Governor, that he cannot do during a protracted illness. Section 4764 of Hemingway's Code, enumerates certain important functions which are not designated as duties but are termed "powers of the Governor." To adopt appellants' contention, means that during a protracted illness of the Governor, such as paralysis for many months, none of these vitally necessary and important functions can be carried out, the same not coming within appellants' classification of "duties."

III. The framers of the Constitution intended to distinguish between the tenure of office in the case of a vacancy, and the functions of the office in the case of absence or inability to serve.

Appellants press the point that if this court refuses to accept the distinction which they draw between the

first and second sentences of section 131, then the intention of the framers to draw a distinction is utterly lost sight of. This does not follow. The first sentence of section 131 merely re-establishes the same section as it existed in the Constitution of 1832, and takes care of those situations where through death, impeachment, or resignation, the office itself becomes vacant, and the tenure of the office is no longer in the person elected. The second sentence of section 131, on the other hand, is obviously designed to take care of a new situation not mentioned at all in the Constitution of 1832, and that is a situation where the incumbent being absent or ill, is unable to perform the functions of the office, though the tenure of the office is still in him. This is the distinction which the framers of the Constitution sought to draw. Such a meaning is in accord with the intent of the framers to distinguish between the two situations, and at the same time to provide for the welfare of the state and its people by arranging for some one to exercise executive authority at every given moment. The authorities support our contention. *Brady* v. *Howe,* 50 Miss. 607, 1874; *In re Crump,* 135 Pac. 428, 47 L. R. A. (N. S.) 1036. See also *People, ex rel. Attorney-General* v. *Wells,* 2 Calif. 198.

IV. The pardon granted to appellee is valid since the Lieutenant Governor was acting as *de facto* Governor even though not acting *de jure.* The pardon itself shows upon its face that the Lieutenant Governor was essaying to act under color of title as Acting Governor of the state, and that he was in actual possession of the office. The pardon issued to appellee is sealed with the great seal of the state, which, according to section 126 of the Constitution, must be kept by the Governor and used by him officially. The secretary of state duly attested same in his official capacity, thus affording recognition

to the claim of the Lieutenant Governor that he was acting as Governor of the state. *Marbury* v. *Madison*, 1 Cranch, 137, 2 Law Ed. 67. It is clear, therefore, that the Lieutenant Governor was in possession of the office and was acting under color of title, and since no one save himself within the sovereign confines of the state was Governor *de jure,* then full recognition must be given to his act as *de facto* executive. *Ex parte Norris,* 8 S. C. 408 (1876); *Cocke* v. *Halsey,* 10 L. Ed. 71; *Ex parte Ward,* 43 L. Ed. 451; *Nofire* v. *U. S.* 41 L. Ed., 657.

V.  The pardon is valid under the rule of contemporary construction of these constitutional provisions by the various departments of government. Under our theory of government, with its separation of powers, it is evident that those who are charged with official duties, whether executive, legislative, or judicial, must necessarily construe the Constitution and laws in numerous instances. *Marbury* v. *Madison,* 1 Cranch, 137, 2 L. Ed. 60.

The case of *Brady* v. *Howe,* supra, was decided in 1874 and attracted a great deal of comment. We submit that not only is this case an authority for appellee here, but that this case construing section 131 of the Constitution became incrusted upon such section as much as if an integral part thereof. When, therefore, this section was re-adopted by the framers of our present Constitution they did so with full knowledge of the construction so put upon it by the court.

For the last twenty years the record shows the exercise of authority by the Lieutenant Governor from time to time during the absence of successive chief executives from the state. All three departments of government have construed the sections of the Constitution here involved, and all three, from 1874 to the present time, have uniformly acted on the assumption that during the ab-

sence of the Governor for any length of time, all the
functions of the office devolve upon the Lieutenant-Gov-
ernor.

In affirming the decree of the court below, and uphold-
ing the authority of the Lieutenant Governor in the
premises this court will be carrying out the intention of
the framers of the Constitution in re-enacting in the Con-
vention of 1890 the important provisions here involved.

Argued orally by *Clayton D. Potter,* Attorney Gener-
al, and *H. T. Odom,* Assistant Attorney General, for the
appellants and *Francis Harmon,* for the appellee.

ETHRIDGE, J., delivered the opinion of the court.

This is an appeal from a judgment in *habeas corpus*
discharging the appellee, Walter Cleveland, from the
state penitentiary; said discharge being based upon a
pardon issued by the Lieutenant Governor of the state.
The case comes here on an agreed statement of facts,
which is as follows:

"That the relator on the 11th day of November, 1922,
was a convict in the Mississippi state penitentiary, and
that he had properly had published and filed in the office
of the Governor of the state a petition praying that he be
granted a pardon for the offense of which he had been
convicted, and that on the 11th day of November, 1922,
that said petition for pardon filed and with publication
properly proved was on file in the office of the Governor
of the state of Mississippi.

"It is further agreed that on the 11th day of Novem-
ber, 1922, that the Governor of Mississippi, Hon. Lee
M. Russell, left the city of Jackson, about twelve-thirty
a. m. for Memphis, Tenn., and was out of the State of
Mississippi from about six o'clock a. m. November 11,
1922, until about twelve o'clock noon November 11, 1922.

"It is further agreed that the Governor of Mississippi, Hon. Lee M. Russell, had not requested the Lieutenant Governor, Hon. H. H. Casteel, to act as Governor during his absence from the State. It is further agreed that at ten-thirty o'clock a. m. the Governor of Mississippi was absent from the state, being temporarily in the state of Tennessée, spending a part of the day. It is further agreed that while the Governor was absent from the State, during the hours set out, that the Lieutenant Governor of Mississippi, Hon. H. H. Casteel, issued a pardon to relator in all respects proper in form, attested by the secretary of state of Mississippi, and having affixed thereto the great seal of the state of Mississippi. It is further agreed that the said pardon so issued by the Lieutenant Governor at the hour of ten-thirty a. m. on November 11th, while the Governor, Lee M. Russell, was beyond the bounds of the state of Mississippi and in the state of Tennessee, was delivered to Hon. Woods C. Eastland, attorney for the relator, who was authorized by the above-named convict to act for him and receive said pardon, and said pardon was delivered about the same time, and while the Governor was still out of the state, to Hon. J. J. Coman, secretary of the state penitentiary, with the request that he forthwith release the relator.

"It is further agreed that notwithstanding the pardon issued by the Lieutenant Governor under the circumstances above set out that the superintendent of the state penitentiary refuses to recognize said pardon as authority on his part to release the relator, and that, notwithstanding the said pardon issued by the Lieutenant Governor, the relator is still held in custody by the defendant in this action. It is agreed that this case be submitted to the chancellor upon the facts above stated as constituting the true facts."

Two questions are presented for consideration on this appeal: First, was the Lieutenant Governor at the time

of the issuing of the pardon, authorized to act as Gov--ernor? Second, if so, did he have the power to grant a pardon? The pertinent sections of the Constitution which control this decision are sections 116, 124, 128, and 131, which read as follows:

"Sec. 116. The chief executive power of this state shall be vested in a Governor, who shall hold his office for four years, and who shall be ineligible as his immediate successor in office."

"Sec. 124. In all criminal and penal cases, excepting those of treason and impeachment, the Governor shall have power to grant reprieves and pardons, to remit fines, and in cases of forfeiture, to stay the collection until the end of the next session of the legislature, and by and with the consent of the Senate to remit forfeitures. In cases of treason he shall have power to grant reprieves, and by and with consent of the Senate, but may respite the sentence until the end of the next session of the legislature; but no pardon shall be granted before conviction; and in cases of felony, after conviction no pardon shall be granted until the applicant therefor shall have published for thirty days, in some newspaper in the county where the crime was committed, and in case there be no newspaper published in said county, then in an adjoining county, his petition for pardon, setting forth therein the reasons why such pardon should be granted."

"Sec. 128. There shall be a Lieutenant Governor, who shall be elected at the same time, in the same manner, and for the same term, and who shall possess the same qualifications as required of the Governor."

"Sec. 131. When the office of Governor shall become vacant, by death or otherwise, the Lieutenant Governor shall possess the powers and discharge the duties of said office. When the Governor shall be absent from the state, or unable, from protracted illness, to perform the duties

of the office, the Lieutenant Governor shall discharge the duties of said office until the Governor be able to resume his duties; but if, from disability or otherwise, the Lieutenant Governor shall be incapable of performing said duties, or if he be absent from the state, the president of the Senate *pro tempore* shall act in his stead; but if there be no such president, or if he be disqualified by like disability, or be absent from the state, then the speaker of the House of Representatives shall assume the office of Governor and perform said duties; and in case of the inability of the foregoing officers to discharge the duties of Governor, the secretary of state shall convene the Senate to elect a president *pro tempore*. The officer discharging the duties of Governor shall receive compensation as such. Should a doubt arise as to whether a vacancy has occurred in the office of Governor, or as to whether any one of the disabilities mentioned in this section exists or shall have ended, then the secretary of state shall submit the question in doubt to the judges of the supreme court, who, or a majority of whom, shall investigate and determine said question, and shall furnish to said secretary of state an opinion, in writing, determining the question submitted to them, which opinion, when rendered as aforesaid, shall be final and conclusive.''

The determination of the first question turns upon the meaning of the words ''when the Governor shall be absent from the state,'' in section 131 of the Constitution. It is insisted by the appellant that the word ''absent'' is used in such sense as would make it an effective absence and that it does not apply to a mere temporary absence as in the present case of less than a day, or in any case of a short period of time when the Governor had not called the Lieutenant Governor to act in his stead and cites and relies upon *State* v. *Lahiff,* 146 Wis. 490, 131 N. W. 824, Ann. Cas. 1912C, 350; *Mayor* v. *Moran,* 46

Mich. 213, 9 N. W. 252; *Watkins* v. *Mooney,* 114 Ky. 646, 71 S. W. 622; *People* v. *Parker,* 3 Neb. 409, 19 Am. Rep. 634; *State ex rel. Crittenden* v. *Walker,* 78 Mo. 139; and *State* v. *Graham,* 26 La. 568, 21 Am. Rep. 551.

Most of these cases deal with the word "absence" as used in a statute applying in cases where the mayor of a city or municipality is absent, that the duties of his office will be performed by the named officer mentioned in such statute. In the case of *People* v. *Parker,* 3 Neb. 409, 19 Am. Rep. 634, the question at issue was not decided, the case turning upon another point, but the writer of that opinion, while reserving the question here involved, said:

"Upon the first proposition my own mind is not clear. I can say, however, when the question was first presented to me, I was strongly inclined to the opinion insisted upon for the respondent, that, so soon as the Governor sets his foot beyond the limits of our state, the officer next in succession therein, may at once assume all the authority, and exercise all or any of the duties pertaining to the executive department of government. But when I reflect upon the possible consequences of such a construction of the Constitution, upon the disgraceful tricks, strifes and exhibitions, which might be entailed upon the people of the state, of which our present attitude presents a sad and humiliating commentary, I am induced to hesitate and cast about me for a more salutary rule, one which, while it will insure the efficient administration of the affairs of state during a brief temporary absence of the executive, will at the same time protect this department of the government against unnecessary and ill-advised intrusion."

This utterance is, of course, not authority. In the case of *State ex rel. Crittenden* v. *Walker,* 78 Mo. 139, the Missouri court held that the temporary absence of the Governor from the state in the discharge of duties imposed upon him by the law does not of itself author-

ize the Lieutenant Governor to assume the functions of the Governor's office during his absence. The section of the Constitution of that state under consideration there provided:

"In case of the death, conviction or impeachment, failure to qualify, resignation, absence from the state, or other disability of the Governor, the powers, duties and emoluments of the office for the residue of the term, or until the disabilities shall be removed, shall devolve upon the Lieutenant Governor."

In that case the Governor was absent for several days and the court reached the conclusion that the Lieutenant Governor was not entitled to the salary of the office during that period; the Governor being absent on business imposed upon him by the law of the state during said time.

The case of *State* v. *Graham,* 26 La. 568, 21 Am. Rep. 551, was also a suit involving the right of the Governor to the salary of the office during a period of time when he was absent from the state, and during which time the Lieutenant Governor had drawn the salary and the state authorities refused to issue the Governor his salary; the Constitution of that state providing:

"In case of impeachment of the Governor, his removal from office, death, refusal or inability to qualify or to discharge the powers and duties of his office, resignation, or absence from the state, the powers and duties of the office shall devolve upon the Lieutenant Governor for the residue of the term or until the Governor, absent or impeached, shall return or be acquitted or the disability removed." Art. 53.

The court of that state held that the absence referred to in the Constitution was not a temporary absence, and gave the word "absence" the meaning, as an effective absence or one prejudicial to the public welfare.

In our view of the case these decisions are strained constructions, and the courts were influenced by hard-

ships, imagined or real, that would flow from adhering
to the strict meaning of the word "absent." In Words
& Phrases, Second Series, vol. 1, p. 16, we find the fol-
lowing:

"Absent is the state of being away from a place; with-
drawal from a place; not existing"—citing Carman's
Adm'r v. I. C. Railroad (Ky.), 92 S. W., 954, 956.

And in Words and Phrases, First Series, vol. 1, pp.
33 to 37, numerous cases defining the word "absence"
are cited.

The usual definition of the word is from Webster's
Dictionary, which defines it as:

"Absent is the state of being away from a place, with-
drawal from a place."

Black's Law Dictionary defines "absent" as a state
of being removed or away from one's domicile or usual
place of residence. In our view of the word, as used in
our Constitution, it contemplated that whenever the Gov-
ernor departed from the state the Lieutenant Governor
would perform the duties of that office; that the Consti-
tution contemplated having within the limits of the state
at all times a person to exercise the powers and perform
the duties of the Governor's office to the end that the
public welfare would never be jeopardized by not hav-
ing some person present who could exercise these powers
and duties. The sections of the Constitution above quoted
show that the Constitution makers selected the Lieuten-
ant Governor as the person who would exercise these
powers ordinarily in the absence of the Governor. It
further provided for this power to be exercised by other
persons in case the Lieutenant Governor should also be
absent or unable to perform the duties and exercise the
powers of the office. The Lieutenant Governor is se-
lected in the same way as the Governor and must possess
the same qualifications as the Governor. He and the
Governor are each elected by the people with the pro-

visions of the Constitution before them. It was assumed and we must presume that each would be qualified and be a proper person to exercise the powers and perform the duties and that each would have equally high and lofty motives and purposes in view in the performance of these functions.

A direct authority and one which to the minds of the majority of the court is satisfactory in its reasoning and conclusions is the case from Oklahoma styled *In re Crump,* 10 Okla. Cr. 133, 135 Pac. 428, 47 L. R. A. (N. S.) 1036, which was a case very much like the one before us. In that case the pardon was granted by the Lieutenant Governor acting as Governor in the absence of the Governor from the state. The Governor had gone to a point outside of the state, but within nine hours' run of the state line and about twelve hours' run from the State Capitol, and during this absence the pardon was granted by the Lieutenant Governor, and the pardon was delivered during the absence of the Governor. The case was a case of *habeas corpus,* and the respondent alleged that the purported pardon attached to the petition for *habeas corpus* was void because the Governor was qualified to act, and that the occasion contemplated by the Constitution for the Lieutenant Governor to act had not arisen; that the Governor had left the state to be temporarily absent for only one day, nor was he at said time in any way incapable, and that he had not removed from the state nor had he before leaving the state, nor at any time, requested the Lieutenant Governor to act in his place or stead; that the Governor had informed the chief clerk in his office as to his whereabouts, and gave the said clerk instructions that if any matter involving executive action should be presented he should immediately communicate with the said Governor, and that the said Governor returned to Oklahoma, being absent only nine hours and from the Capitol only twelve hours, and

directed the authorities to disregard the said pardon issued by the Lieutenant Governor and to hold the petitioner, setting forth in his answer the proclamation revoking or attempting to revoke the pardon issued by the Lieutenant Governor. In the opinion of the court (10 Okl. Cr. 152, 135 Pac. 436, 47 L. R. A. [N. S.] at page 1046) the court said:

"The functions of chief magistrate were created for the benefit of the state, and are local to it; and, as the constitutional functions of his office cannot be exercised out of the state, the effect of his absence from the state is to suspend his constitutional functions, and thereupon these functions devolve upon the Lieutenant Governor, and he becomes and is *de jure* and *de facto* Governor until the absent Governor returns to the state. It is further provided by article 6, section 15, already quoted, that if, during a vacancy in the office of Governor, the Lieutenant Governor shall 'be absent from the state, the president *pro tempore* of the Senate shall act as Governor until the disability shall cease, and, if the president *pro tempore* of the Senate be absent from the state, the speaker of the House of Representatives shall act as Governor until the disability shall cease. In all this there is a perfect consistency pervading both sections. The unequivocal language of the latter clause of section 16 is that, upon his removal from the state, said office shall devolve upon the Lieutenant Governor until the disability shall be removed, and the plain intention of the framers of the Constitution and the people in adopting it was to provide that, in his absence from the state for any purpose or for any period of time, however short, his constitutional functions shall devolve upon the Lieutenant Governor as acting Governor. Such absence from the state is an abdication for the time being of the constitutional functions of his office, and the effect of that absence is to suspend his constitutional functions. He

does not cease to be Governor by his temporary absence from the state. His vested right of tenure in the term of office attaches to his person and is distinct from his executive functions; it goes with him; but the constitutional functions of his office belong to the public, and are confined to the state, and cannot be exercised out of the state; when he leaves the state, the constitutional functions of his office devolve *pro tempore* upon the Lieutenant Governor; and, when he returns to the state *ipso facto,* he resumes all of the powers, functions, and duties of his office, and the Lieutenant Governor theretofore administering the executive functions temporarily under the Constitution ceases to be acting Governor.' "

We are of the opinion therefore, that whenever the Governor is beyond the confines of the state he is absent from the state, and he cannot perform the duties of his office during such absence, and the functions of the office are vested in the Lieutenant Governor.

It is contended by the appellant that the Lieutenant Governor could not grant pardons because, under section 131 of the Constitution, above set out, he only discharges the duties of the office, and that the granting of a pardon is not a duty of the office, but is the power as to which the Governor has a discretion, and may or may not grant in any case.

It is insisted that, when the Governor's office becomes vacant by death or otherwise, the Lieutenant Governor then possesses the powers and discharges the duties of said office, but when the Governor's office is not vacant, but he is merely absent from the state or unable on account of illness to perform the duties of the office, then the Lieutenant Governor shall discharge the duties of the office until the Governor be able to resume his duties and that the framers of the Constitution purposely omitted to confer upon the Lieutenant Governor the powers of the office in such contingency, and that the duties re-

ferred to in the Constitution are such as are of a mandatory character and must be performed at all events. While a pardon is a matter of grace, it is nevertheless the grace of the state, and not the personal favor of the Governor. It is granted out of consideration of public policy, for the benefit of the public as well as of the individual, and is to be exercised as the act of the sovereign state, not of the individual caprice of the occupant of the executive office as an individual. He is supposed to act in accordance with sound principles and upon proper facts presented to him. Of course, he is the sole judge of the sufficiency of the facts and of the propriety of granting the pardon, and no other department of the government has any control over his acts or discretion in such matters. Nevertheless he acts for the public. He dispenses the public mercy and grace; the efficacy of the pardon flows from the sovereign. The sovereign acts through the Governor, but it is none the less the act of the sovereign, and not the personal act of the Governor. When the Governor is absent from the state, the Lieutenant Governor, if he is present and capable of acting, is the custodian of this mercy and grace. It is difficult to separate the words "powers" and "duties," or to conceive of powers without duties, or duties without powers. When a proper application is presented to the Governor, he is under duty to consider it; he has power to consider it; and while no authority other than his judgment and conscience can determine whether it is proper to grant or refuse the pardon, still his duty is to act upon the matter, to bring his mind and conscience to bear upon it, and to reach a determination in reference thereto. After so doing, if the application is meritorious, he grants the pardon; if it is otherwise, he refuses it. The powers and the duties of the executive office are conferred for state or public purposes, and in many cases they are used interchangeably.

While there is no direct authority in this state for the view we have taken, yet this court had under consideration the question in *Brady* v. *Howe,* 50 Miss. 607, which case arose in the year 1874; the present constitutional provision being enacted or promulgated in 1869. In that case, during the absence of the Governor, the Lieutenant Governor reappointed one Simmons as chancellor, when a vacancy arose, due to the expiration of his term of office. Simmons accepted and qualified, and took a leave of absence, and did not return to the state for several weeks. The Governor returned to the state and appointed another person, one Campbell, as chancellor. The chancellor had power to appoint a clerk of his court, and each of the appointees undertook to exercise the power and appoint a clerk, and a proceeding was instituted by the district attorney against the clerk who was appointed by Campbell, Governor Ames' appointee. The chancellor appointed by Governor Ames obtained possession and was exercising the functions of the office, and while the court held that neither appointment was valid so far as the chancellor was concerned, but the chancellor being in office and exercising the function thereof was a *de facto* officer, and that his act in appointing the clerk as such was valid. In discussing the question, the court stated that, if the Governor had the power to appoint when present, the Lieutenant Governor would have the power when he was absent. At page 620, the court said:

‑"The seventeenth section of the fifth article is to the effect 'that when the office of Governor shall become vacant by death or otherwise, the Lieutenant Governor shall possess the powers and discharge the duties of said office.' . . . 'When the Governor shall be absent from the state . . . the Lieutenant Governor shall discharge the duties of said office . . . until the Governor be able to resume his duties.' In the first-named contingency, the office is absolutely devolved upon the Lieuten-

ant Governor. In the second, the duties of the office are temporarily to be performed by the Lieutenant Governor. There is nothing in the language, or in the reason for the provision, which would confer part of the duties only upon him. The words are 'duties of the office;' that is, all of them. If there had been an enumeration of some of them, that would have excluded all others. If, therefore, the Governor could have legally made the appointment, in his absence from the state, the Lieutenant Governor could have done so.''

The only thing in this decision that prevents it from being absolutely in point is the fact that neither the Governor nor the Lieutenant Governor had the right to make the appointment because of the requirement of the Constitution as it then existed that the office be filled by the Governor by and with the advice and consent of the Senate, and inasmuch as the Senate had not consented to the appointment that it was invalid, and neither the Governor nor the Lieutenant Governor had the right to make the appointment. It was clearly the opinion of the judges then composing this court that the Lieutenant Governor, in the absence of the Governor, was possessed of all the functions of the office. The Oklahoma court in the case above cited reached the same conclusion, and the opinion in that case is an able one and seems to me an unanswerable exposition of the principles here involved.

In the case note appended to the case of *In re Crump,* 47 L. R. A. (N. S.), at page 1037, the editor of that series says:

''Thus, while there appears to be little authority upon the point here raised, the decision in *Re Crump* seems to be correct, under general principles, in holding that, under a Constitution providing that, among other disabilities named, in case of the removal of the Governor from the state, the office of Governor, with its compensation, shall devolve upon the Lieutenant Governor for

the residue of the term, or until the disability shall be removed, an unconditional pardon granted to one convicted of crime and imprisoned therefor, being granted by the Lieutenant Governor at a time when the Governor is temporarily absent from the state, is valid and effectual."

In the view which we reach, the Lieutenant Governor at the time of the granting of the pardon was a *de jure* occupant of the Governor's office possessed of the powers and duties thereof, and it is unnecessary to discuss whether the doctrine of *de facto* officer would render the pardon valid, if he were acting without authority of law, but under claim of right, and in the actual possession of the office. Something was said in the argument that, under the concluding clause of section 131 of the state Constitution:

"Should a doubt arise as to whether a vacancy has occurred in the office of Governor, or as to whether any one of the disabilities mentioned in this section exists or shall have ended, then the secretary of state shall submit the question in doubt to the judges of the supreme court, who, or a majority of whom, shall investigate and determine said question, and shall furnish to said secretary of state an opinion, in writing, determining the question submitted to them, which opinion, when rendered as aforesaid, shall be final and conclusive,"— and that the Lieutenant Governor could not exercise the powers because the question was not so submitted and decided. It is unnecessary to discuss the meaning of this part of the section, because the agreed statement of facts shows that the Governor was absent, and the question was not in doubt at any time so far as this record shows.

It follows that the judgment of the court below was correct, and it is accordingly affirmed.

*Affirmed.*

ANDERSON, J. (dissenting).

I am unable to agree with the majority of the court that the Governor was absent from the state in the sense of the Constitution. In my judgment, the absence referred to in section 131 of the Constitution means such an absence from the state as will effectually prevent the Governor from exercising the powers and duties of his office. In other words, it must be an effective absence. The only authority referred to in the majority opinion which tends to sustain the contrary view is *In re Crump,* 10 Okl. Cr. 133, 135 Pac. 428, 47 L. R. A. (N. S.) 1036, the reasoning of which, although specious, appears to me to be unsound. On the other hand, *State* v. *Graham,* 26 La. 568, 21 Am. Rep. 551; *State ex rel. Crittenden* v. *Walker,* 78 Mo. 139; *People* v. *Parker,* 3 Neb. 409, 19 Am. Rep. 634; *Watkins* v. *Mooney,* 114 Ky. 646, 71 S. W. 622; *Mayor* v. *Moran,* 46 Mich. 213, 9 N. W. 252; *State* v. *Lahiff,* 146 Wis. 490, 131 N. W. 824, Ann. Cas. 1912C, 350—are directly in point, and the reasoning especially of the Louisiana, Missouri, and Kentucky courts in the cases referred to is remarkably lucid and logical, and, in my judgment, sound. The majority opinion quotes from some of these cases at length. Those quotations sustain this dissent.

There was involved in the Louisiana Case, *State* v. *Graham, supra,* the question whether the Governor of that state was absent within the meaning of its Constitution, the duties and powers of the office of Governor thereby devolving upon the Lieutenant Governor. In discussing the question the court said:

"The relator avers that his salary as Governor of the state was due him for the periods from the 6th to the 19th of May, 1871, and from the 26th of June to the 17th of July, 1871; that he drew his warrant therefor on the auditor of public accounts on the 22d of September,

1871; that payment of this warrant was refused on the grounds that the relator was absent from the state during said periods and that the duties and prerogatives of Governor devolved on the Lieutenant Gov .rnor, to whom the salary of Governor for said periods had been paid. There was judgment in favor of the relator and the defendant appealed. The question to be decided is: Does the absence of the Governor from the state for a few hours or a few days create a vacancy in this office, and authorize the assumption of the duties, prerogatives and emoluments thereof, by the Lieutenant Governor, during said absence? The constitutional provisions on the subject are contained in articles 53 and 54 of the Constitution. Article 53 says: 'In case of impeachment of the Governor, his removal from office, death, refusal or inability to qualify or to discharge the powers and duties of his office, resignation, or absence from the state, the powers and duties of the office shall devolve upon the Lieutenant Governor, for the residue of the term, or until the Governor, absent or impeached, shall return or be acquitted, or the disability removed,' etc. Article 54 declares that the officer discharging the duties of Governor during his administration shall receive the compensation to which the Governor would have been entitled. It is evident, if the Lieutenant Governor be authorized to. exercise the functions of the Governor during any temporary absence of the Governor from the state, he may also, whenever the Governor is unable to attend to the duties of his office on account of sickness—in case 'of inability to discharge the powers and duties of his office.' We do not believe this t be the meaning intended by the framers of the Constitution. The inability to discharge the duties of the office as well as the absence from the state, spoken of in the article, are such as would affect injuriously the public interest. The mere absence, at Pass Christian, within a few hours' run of the capital, could not, by any possibility, affect the public interest.''

And what the supreme court of Nebraska said in part in *People* v. *Parker, supra,* seems especially appropriate to the facts here, which is in this language:

"But when I reflect upon the possible consequences of such a construction [that of the majority opinion in this case] of the Constitution, upon the disgraceful tricks, strifes, and exhibitions which might be entailed upon the people of the state, of which our present attitude presents a sad and humiliating commentary, I am induced to hesitate and cast about me for a more salutary rule, one which, while it will insure the efficient administration of the affairs of the state during a brief temporary absence of the executive, will at the same time protect this department of the government against unnecessary and ill-advised intrusion."

The last clause of section 131 of the Constitution is in this language:

"Should a doubt arise as to whether a vacancy has occurred in the office of Governor, or as to whether any one of the disabilities mentioned in this section exists or shall have ended, then the secretary of state shall submit the question in doubt to the judges of the supreme court, who, or a majority of whom, shall investigate and determine said question, and shall furnish to said secretary of state an opinion, in writing, determining the question submitted to them, which opinion, when rendered as aforesaid, shall be final and conclusive."

By this provision of the Constitution, in my judgment, a remedy is provided for the very character of controversy between the Governor and Lieutenant Governor as has arisen in this case. The framers of our Constitution foresaw the probability of just such a conflict of authority and provided a remedy therefor. And that remedy is simply this: That whenever a controversy shall arise between the Governor and Lieutenant Governor as to who shall exercise the functions of the office of Governor,

it is the duty of the secretary of state, when such a controversy is brought to his attention, to submit the question to the judges of the supreme court for decision, whose decision shall be final and conclusive, and until such decision is made the duties and powers of the office go with the one who is in charge thereof assuming to act as Governor, whether he be the Governor or Lieutenant Governor. It is inconceivable that the makers of our Constitution left this question open to be determined by parol testimony. If the majority opinion in this case be sound, then it may often be a question, to be determined by the testimony of witnesses, as to who is Governor, or rather who is entitled to act as such, which amounts to the same thing. The records and memorials kept by the state will count for nothing. Take, for illustration, this condition of affairs: The Governor accepts an invitation from a friend to play golf on a golf course on the line between Mississippi and Alabama, partly in this state and partly in that. The game is going on for a half day; several are engaged in it; it is quite an occasion; there are many visitors. In the progress of the game the Governor is in Mississippi when he hits the ball one time, and in Alabama when he hits it the next time, and so forth and so on, resulting in his being in and out of Mississippi maybe dozens of time before the game is over. According to the majority opinion, every time he crosses the state line into Alabama he loses his office for the time being, and the Lieutenant Governor is Governor, and when he crosses the line back into this state he is Governor again, and the Lieutenant Governor is down and out. In other words, now he is and now he ain't, and now he is and now he ain't, and so on as long as the game goes on. And during the time the Lieutenant Governor has heard of the game, and thereupon rushes to the capital of the state, and seizes the Governor's office and the great seal of the state, issues par-

dons to criminals, one after another, and appoints circuit judges, and chancellors and supreme court judges to fill vacancies. And then the question arises in the courts which ones, if any, of these pretended official acts are legal. The Lieutenant Governor, while acting as Governor, has had a time-keeper, who has kept the record of when the various official acts were performed. They testify. And the witnesses at the golf game are brought in and put upon the stand, and necessarily, although they were watching the Governor closely while engaged in the game, there is great conflict as to whether he was in Mississippi or in Alabama at the various times in question. Is it believable that the wise men of our Constitution failed to provide against this condition of affairs —such absurd, ridiculous results. I am glad to say I do not believe any such thing.

The Governor was in Memphis when this pardon was granted by the Lieutenant Governor, only a few miles from the state line, in telephone call from his office, only seven hours' run by railroad from the capital, and was there only about six hours; he could have been called back at any time he was needed; he had not called upon the Lieutenant Governor to take his place during his brief absence; the public interest was not jeopardized. I say the Lieutenant Governor had no right to take his place, unless requested so to do by the Governor, or until the situation became so grave as to cause the secretary of state to submit the question to the judges of the supreme court, as provided by the provision of the Constitution above quoted, and they had decided that the Governor was absent from the state in the sense intended by the Constitution.

Cook, J., joins me in this dissent.

On Suggestion of Error.

[98 So. 543].

Per Curiam:—We adhere to the views herein expressed in our former opinion, from which it follows that the suggestion of error must be overruled.

*Overruled.*

Holden, J., (concurring).

The suggestion of error filed by the attorney-general's office again presses the point that the Governor's absence from the state was of such a temporary nature that it did not constitute an absence in the sense of the Constitution, causing a vacancy in the office.

It is also again urged that the last clause of section 131 of the Constitution is applicable in the case, and that the question of whether there was a vacancy when the Governor was in another state for a few hours should have been submitted to the judges of the supreme court for decision. This clause provides that "should a doubt arise as to whether a vacancy has occurred in the office of Governor, or as to whether any one of the disabilities mentioned in this section exists or shall have ended," it is to be submitted to the supreme judges.

I adhere to the views expressed in the main opinion; and that when the Governor is out of the state for any length of time I think a vacancy in the office then and there occurs, and it is immaterial as to what length of time he may have been out of the state, or what distance he had gone beyond the borders of the state. He might be in an adjoining state at a ball game or on a visit to Europe, or he may be away for several hours or several months. In either event there is a vacancy in the office according to the language of the Constitution, section 131, which provides:

"When the Governor shall be absent from the state,

. . . the lieutenant governor shall discharge the duties of said office until the Governor be able to resume his duties."

He is not Governor when out of the state, so far as being able to act. It would be violating the language and spirit of this constitutional provision, and would also be venturesome on the part of this court, to hold or attempt to prescribe the length of time the Governor must be out of the state, or the distance he must be away from the state before a vacancy occurs, which empowers the lieutenant to act. It would not be safe to adopt any rule, except that, when the Governor is beyond the borders of the state, this fact automatically causes a vacancy in his office, and the lieutenant governor, who is made a substitute for the Governor in his absence, with the powers and duties of the Governor, shall exercise the functions of that office.

. It was never intended the full functioning of the Governor's office should be suspended for one minute on account of the Governor's absence, or for any of the other reasons named in the Constitution, such as protracted illness, incapacitating the Governor from performing the duties of his office. It was intended by the makers of the Constitution that the lieutenant governor, who must have the same qualifications of the Governor, should take the shoes of the Governor, and discharge the duties and powers of the office in his stead, and as his lieutenant in his absence from the state, or when he is unable to serve.

I must again disagree with counsel for the state in the argument that the question of whether there is a vacancy in the office of the Governor on account of any of the reasons named in section 131 should be submitted to the supreme court judges, because the agreed facts in the instant case show the Governor was out of the state at the time the lieutenant governor issued the pardon.

If there was a controversy of fact as to whether he was out of the state at the time, "or as to whether any

134 Miss.—11.

one of the disabilities mentioned in this section exists or shall have ended'' such as disability from protracted illness, then it is probably true such question might be submitted for determination by the supreme court judges. But no such question is in this case.

I can easily imagine a controversy arising, wherein the Governor might claim that he was not out of the state, and the lieutenant governor might claim that the Governor was out of the state, or it might be claimed and disputed that the Governor was unable to act because of protracted illness, or that he had recovered from illness. If such a controversy arose, then the latter part of section 131 could probably be invoked. But that is not the case before us.